Good morning. Good morning. I please the court Jonathan Libby appearing on behalf of Appellant Edward Ferguson. Your Honor, Mr. Ferguson's convictions must be reversed because the two charged mailings occurred after the scheme to defraud was complete in October 2008. There appears to be no real dispute that in October 2008, prior to either of the charged mailings, Mr. Ferguson stopped accepting any investments from anyone and had essentially taken all of the money that he intended to take. Don't you have to deal with the lulling letter problem, counsel? Well, of course, it's our position that the letters, in fact, were not lulling letters. Aren't they almost classic lulling letters under our case law? For example, Maronite, Tanque, and Schmuck? Your Honor, our position is, and this we're taking from the Supreme Court case in Lane, where the mailings, rather than acting to lull, instead increased the probability that the defendant would be detected and apprehended, then they're not in furtherance of the scheme to defraud and would not be considered lulling letters. And here, while certainly there was some language in the mailings, and I'll focus first on the November mailing, there was certainly some language that would perhaps suggest some amount of lulling. Well, for example, on page EER 82, you said, question, have I lost any money? Answer, absolutely not, in bold caps. Your principal and interest are still in your account. The funds are just not available for withdrawal. Isn't that a lulling concept? That is a lulling concept, certainly, Your Honor. So that's one. But I think you have to look at the totality of the mailing, and what this mailing, in fact, included was language that made clear that all of your accounts are frozen, you'll not be able to withdraw any money from these accounts anymore, there's not going to be any more interest being paid, any outgoing withdrawals are now canceled, all pending transactions are canceled, and the result of this was what you would expect it to be, which was But you also mentioned that there's a new fund, and they'd be allowed to invest in a new fund, and I guess my question from that is, I mean, couldn't you reasonably believe that the soliciting investments in the new fund was part of the same overall scheme, and part of the lulling? Your Honor, I don't think he says that. He says they're freezing the accounts. You can freeze an account, that means the money's still there, right? Well, that's right. I mean, it wasn't, but yes, that's right. Well, I mean, that's what he was, right, see, that's the whole point. He was telling him he was freezing it, so the money was still there, even though the money was actually gone. That's right, but you have to, again, you look at the mailing as a whole to see what the effect would be on the person reading it. Well, if you said your money's gone, people would be running right to the authorities, but telling them your money is not gone, it's just not available, certainly seems to, for some people, that would say, okay, well, I can wait, because I'll be okay. Except here, we have from the testimony of the investors that they did essentially run to authorities, that in fact, their reaction to this mailing was- But that wasn't the intent of this letter. I mean, if you look at the questions and answers, the question, they attach a question, have I lost any money, all caps, absolutely not, exclamation point. Your principal and interest are still in your account, the funds are just not available for withdrawal. No, that's right, Your Honor, certainly that's what it says, but again, I go back and refer to the Supreme Court case in Lane, where if in fact, rather than acting to lull, it actually has the ability to do that. Do you have to show, is one of the elements that had to have actually lulled? It's not, no, I don't believe that it actually has to have lulled. Okay, but that, so really, whether they went to the authorities right away or not, isn't relevant then, right? Well, except what the court said was, if it in fact increases the probability that he would be detected and apprehended, that essentially, if it does cause people to be fearful and to run to authorities and to cause an investigation to begin, then in fact, it's not actually a lulling letter. I thought under Schmuck that it's irrelevant whether lulling letters had the intended effect. Isn't that correct? No, that's right. Okay, so your point that people really weren't deceived by this doesn't really help us, because the question is, did he send the letters, not whether it had the intended effect? No, but whether it did in fact have the opposite effect is the point I'm suggesting. I don't see where you get that out of Schmuck. Well, I'm taking from Lane, and so I'm not suggesting again that it had to have the effect of lulling them, but if in fact the letter, whether or not it had that effect, if it had the opposite effect, what the court said in Lane was, then it's not in fact a lulling letter. The jury was correctly instructed, right? The jury was correctly instructed. Your Honor, we didn't challenge the jury instructions here on appeal. The jury instructions... But you didn't previously. We did not. So why isn't this just... I guess, why didn't you just lose? I mean, if you just lost, if the jury instructions were correct, and you argued it, and they didn't buy your argument... No, I'm sorry, Your Honor. We've not made the argument here on appeal that the jury instructions were in error. So I think the jury instructions were not entirely clear when it came to... But I guess what I'm saying is, I'm seeing it as you just lost on the issue. Essentially, you're asking us to say as a matter of law, that's not lulling. I'm saying that on the facts of this case, that this was... So basically, as a matter of law, these facts cannot be lulling. Correct, based on the Supreme Court decision. But if we don't agree with that, then you lost at a jury on that. I'm sorry, Your Honor, then... If we don't, if they reasonably can be, if you take it and the inference that they make could be lulling, then you lost on that issue in front of the jury. I mean, we have to basically say, as a matter of law, on these facts, with all inferences from it, it cannot be lulling under the case law. That's right. I mean, it's not... No, that's correct, Your Honor. You're certainly right on that. Okay. But that doesn't end the analysis here, because what we know from the recent Tanki decision is that even if it was a lulling letter, the question then is, well, had the scheme to defraud ended before the lulling letter was sent? But there's no case law to back that up, is there? I mean, you seem to be saying, yeah, this is a lulling letter, but if it didn't have the intended effect, then it's not a lulling letter. No, I'm saying even if the court were to conclude that this, in fact, was a lulling letter... Right. Our position is it still doesn't matter because it was sent after the scheme to defraud... Do you have any case law that says that you can't have a lulling letter after the last money has come in in a fraud scheme? It's just the opposite, isn't it? You can't know. Certainly, it can happen, but what Tanki said is what the court needs to do is look at whether the scheme to defraud was complete before the lulling took place. Oh, wait a minute. I'd like you to answer my earlier question. Do you have any case law where the facts are roughly these? The perpetrator went forward with the scheme, stopped collecting money, stopped asking for new money, a period of time passed, then a lulling letter was sent out. And the court found that because the scheme had, in quote, stopped, that the letter that was sent is not a lulling letter. Is there case law? Is there a case law like that? I haven't seen any. Well, we discussed the case law in terms of Lazarenko and Sampson and those cases. But those aren't those facts, though, are they? Well, precisely, I mean, are the basic facts in terms of whether or not there was a stoppage and then a lulling letter was sent? Yeah, I mean, those are what the courts are actually discussing in those cases. And that's what came up in Tankey. One of the issues was, well, was the length of time in between after the fraud may have ended and when the letter was sent, you know, that's a factor that the court can consider. There, the court determined in Tankey, that because it was very close in time, among other reasons, that it was considered part of the scheme to defraud, that the scheme to defraud had not actually ended before the letter was sent. And in this case, you claim that the scheme stopped. When was the first letter sent out in this case after the scheme, end quote, stopped? In November 2000. Okay, and when did the scheme stop? October 2000. October, so it's within a month. It is within a month. Okay, and you say that's far too attenuated, it's not part of the same scheme. No, in fact, I mean, in Tankey, the court determined that under the facts of that case, the fact that it was, it was a month, that that was one of the facts under the totality of circumstances that the court could consider. Now, Judge Wallace in his concurrence actually said, you know, to the extent anyone's saying that the one month is now a bright line rule, as opposed to two or three years that we have found, you know, it is too late, that there can't be a bright line rule. But here clearly it fits within the language of the very case, right, that you're talking about, where the court said it was appropriate to consider that? It's absolutely appropriate for this court, for the court to consider the length of time. The court also, however, looked at, in Tankey, what the letter said, what the mailing was in Tankey, and there the court found that it was plausible that the letter there, the letter did facilitate the version of funds into Tankey's bank account. What is the record evidence as to why, what was his name, Ferguson, Mr. Ferguson sent the letters? Did he testify? Mr. Ferguson? No. Okay, what was the evidence as to why he sent the letters in the record? Well, the evidence is the letters themselves, and then we have the reaction from the various investors as to their thought process, their reaction when they received the letters, which was red flags went up, you know, shock, concern, and, you know, calling attorneys, threatening to go to the FBI and the SEC, and ultimately they did go to the FBI and the SEC, and in fact... Was he being investigated before these letters went out? Not criminally, to my knowledge, no, Your Honor. So again, if I could get back to, in Tankey, one of the distinctions that we have between Tankey and here, there, the letter itself that was mailed actually demanded additional payments and interest. So that's where the court, amongst the totality of the circumstances, determined, yes, it was shortly thereafter, and it asked for more money. So yes, a jury could reasonably determine that it was really just another way of trying to get additional funds. But in this case, couldn't a rational juror have concluded that your client was trying to get more funds based upon the language of some of the letters? No, Your Honor, I don't believe so, because the letters at no point asked for additional funds. And again, the government hasn't even alleged that he sought additional investments after October 2008. There's... The indictment itself says that his seeking of investments ceased in October 2008, and he didn't accept any additional investments after that. So we do have a situation where he stopped taking money before these letters were mailed, and they did not ask for additional funds. In fact, he said, you know, we're not accepting anything more. All of your current accounts are frozen, and any current pending transactions are done. And I see I just have a little minute if I could reserve the time. Yes, you may. May it please the Court, Brett Segal, on behalf of the United States. I'm going to start with Judge Smith's last comment about a rational jury, and the standard we're actually here under. When you read the briefs of the defendant and the arguments here, it ignores, really, the standard we're here under. And rational jury, all inferences in favor of the government. Could the jury find all elements beyond a reasonable doubt? And here, the defense is focusing on one or two small arguments that, first and foremost, were rejected by the jury. And second of all, ignores all other testimony, inferences, and the letters themselves. If you focus on the letters, not only the parts that Judge Wardlaw pointed out, but if you look, I think, three questions down, he even says, is my money secure? Capital letters. Yes, the funds remain in the account in a frozen state. The money wasn't in the accounts. The monies were stolen by the defendant at that point. Well, he argues that the letters can't be lulling letters because, as a factual matter, the investors did get alarmed. They did act like Red B. Ginson. And actually, that's not true, either based on the facts of the case and the circumstances. And I'll start with, you can look at the emails and the testimony of the victims. They got these letters in November and December of 2008. And in each of these letters, the defendant's saying, I'm working with you. I'll take legal actions for you if we don't get our money back. Just be patient. Work with me. They don't go to the authorities and they don't start doing anything until 2009, after every promise the defendant has made has now come to fruition. And they start realizing they need some answers. What does the record show about the first, when the timing of the first investor going to the authorities? January 2009. It's Terry Kelly. And let me also point out, there are emails there in the record. I think it's Exhibit 60, which is in the government's excerpts of record, where Terry Kelly even       to the authorities? January 2009. It's Terry Kelly. And let me also point out, there are emails there in the record. I had put off going to the FBI, put off going to the SEC about this. I can't keep putting it off if you won't be transparent with me. And the defendant, and so actually to the exact opposite, these letters did lull them. When they got these letters right away, and there was still some money in the investor account, not enough to have paid off the investors by any means, but there could have been some money there. And instead of the defendant at that point giving investors money, or if the investors had gone to the FBI instantly, there could have been some recovery from the account. By the time they start going to the authorities, the defendant continued to pay himself between the letters and the authorities getting about. The defendant pays himself. He takes trips using the investor money, and he even pays another investor back, which we would also say is further evidence that the scheme was ongoing at the time. But at a minimum, it did lull them. It did keep them from going. And although January 2009 seems like a short window after November and December 2008, it's still enough time for the defendant to keep using their money. And his whole purpose was that. And I'd point out, not only the words directly in the November and December 2008 letters, if you look at Exhibit 58, which is the email correspondence between the defendant and Terry before the mailings went out to all the investors, the defendant sent basically a draft of what this letter was going to be to Terry Kelly. And they had correspondence where Terry Kelly was bothered by the letter and mentioned this. And the defendants replied, this is before the letter even went out. The defendant is trying to convince Terry Kelly to convince all of the other investors that the money is safe. As far as litigation goes, I think the investors will be paid out before it ever comes to anything. It's in our best interest, this is the defendant saying it, to talk to the investors and convince them not to do anything. That is as straight down the middle of a lulling letter as there is. And- What was the timing of these letters in conjunction with the progress of the investigation? Was there some impetus for these letters? The impetus of this letter was in October of 2008, right before these letters came out. The defendant basically starts telling the investors that they're not getting their interest payments. They start realizing there might be some issues with the funds, mainly because the defendant had already siphoned off most of the money, etc. And it started crumbling upon himself. He sends the letters out as an inference that the jury could make, and I think the evidence just flat out said it. The defendant is just trying to placate the victims to make them believe everything is fine, nothing to see here. It's okay, I'm going to get you your money. Your money's still with diversity, the same lie he had been telling them to get the money in the first place. He's continuing to tell them, don't worry, it's stuck in a trade offshore, we're going to get you your money back, and so forth. And so at that period of time, while they say now he didn't take any more investor money, there's nothing in the record saying he stopped purposefully taking money. His ability to collect money versus actually collecting money and trying to collect money are two very different things. There's nothing saying that he specifically stopped, and there's actually evidence to the contrary. As Judge Wardlow, you mentioned in your questioning, the letters talk about continuing in his new fund, how they can invest their money in his new fund going forward. He even says, in the same question and answers, how will I stop this from happening again? And he talks about how he will invest their money going forward, no longer going to use the Forex market. He's going to use other different investment vehicles with their money going forward. The scheme never ended. They're saying now, they want us to believe that the scheme ended, but that's not the case. You're saying the new fund is part of the same scheme? I do. We think it's alternative. As the case law says, the mailing will be in furtherance of the execution of the scheme. After all money has been obtained under two circumstances. One, it's an ongoing scheme, which we believe it is. Or two, it's a lull in the water, and we think since he's talking about new investments, the undercover recording with the FBI agent and the defendant in January 2009, he still talks about what he's going to do with the money he needs. He's only taking accredited investors, how he makes money. And in that same undercover recording in January, tells the same lies about how he can make money, the manner in which he does it. So he's still, and the jury can easily- Until January, though. For all intents and purposes, correct. When was the last payment that he made to himself out of the funds? The last large-scale payment was in January 2009, after both of these letters went out. In January 2009, he writes himself a check for $10,000. Okay, so from the government's perspective, that alone, even if there had been no lulling letters, would show an ongoing scheme, right? Correct. And the jury, I gather, heard this evidence, right? Absolutely, and there was a summary charts of the bank records to show how he collected the money and how he spent the money. And even after the $10,000 that I just pointed out, at that point, there's still $30,000 to $40,000 left in the account. And he uses it to travel, travel what appears to be his family, because there are multiple tickets purchased through the airlines. And so you see him using personal expenditures out of the account, so it's not just the large check he writes for himself. He's still using the investor money to pay himself well into 2009. When did he, I think you indicated that he had basically bought out an investor. When did that occur? There was one investor that he bought out. I'd have to check the notes, but- Was it after October? No. Okay. It would have been in May or June of 2008. All right. I would just like you to see if there was additional evidence showing an ongoing scheme. The only thing with regards to investors, there are three checks he writes to one investor. I believe it's Paradise Found, which is the company of this investor. He writes $700, I think it's $649 or something in that ballpark, each month in December, January, February, or November, December, January. He has three more interest payments to investors, even after the letters came out, or at least one of the letters came out and payments after both letters came out. And as it relates to the ongoing scheme, I would point out in the appellant's opening brief, it said it's not an ongoing scheme because of three things. He wasn't talking to any more investors, he didn't pay himself any more money, and he didn't pay any investors any more money. And because of these three things, it can't be an ongoing scheme. Well, all three of those things are wrong. He did pay himself more money, he did pay investors more money. And as the FBI undercover recording of him said, he was still soliciting, as he called it, accredited investors. So from the government's perspective, since the jury heard this evidence, even if we were to discount the effect or the legitimacy of the lulling letters, that there would still be more than enough for a rational juror to convict him of everything charged here. Absolutely, and I actually think that if you look at the evidence, the evidence points to the victims were lulled, that it's actually contrary to what they're saying now. And I'd probably also go a step further that these letters, let me step back, Judge Smith, you asked the appellant a question about the case law as it relates to lulling versus a completed scheme. And the case law actually says not only the exact opposite, but it supports the other side of the coin. That when you look at Samson, Schmuck, Lane, Manwright, Tamki, every one of them, what you're looking at is to see if all the monies are received, could the mailing be in furtherance of the scheme? And all the case law basically says is in one of two ways. It's a lulling letter or it's an ongoing scheme. And therefore, whether or not the scheme is deemed to be done because no money is collected, the lulling letters themselves means the scheme is ongoing. And that's exactly what we have here, is classic letters telling the clients, all is well, no need to go to the authorities, no need to cause litigation, no need to look at what I'm doing, just be patient, wait for me to fulfill my promises. And that's exactly, you don't even have to infer from his letters in November and December 2008 of what he wants. He tells them, be patient with me, I will secure all of your money, I will fulfill my contracts to you. He's telling them, he's going to do what he's been promising, just wait for him. And the reality is that schmuck says you don't have to be a schmuck in order to have a lulling letter, right? Correct. And actually, you're correct. The same argument of in that case was they had the opposite effect of what we wanted. The people got alarmed. And the Supreme Court said, that doesn't matter. We're not looking at what happened. We're looking at what was the intent and the design of the defendant. And we even see from his own words and his emails to Terry Kelly two days before this letter what his intent was. I want to make the investors not seek litigation, not go to the authorities. So I have a, I'm curious about something. He was convicted on two counts of mail fraud. Based on these two letters, right? Correct. That when I was reading the PSR in paragraph 26 says that he sent victims monthly statements by mail and email that showed their investments were earning the promised monthly returns. Aren't those also acts of mail fraud or wire fraud? Correct. This case could have been charged in a lot of different ways. Every time an investor, as long as it used interstate wires, invested with him and wired their monies in. Every monthly mailing, it easily could have been charged a plethora of different ways. That being said, the indictment itself charges in, actually the exact words are, a continuing scheme to defraud. And the dates that were given were 07 when he first started collecting money all the way through 09 when he had the money and he was depleting the account. It was always charged, proved, and given to the jury in which they convicted him on as a continuing scheme that continued well after these two letters that we're speaking of here. So in hindsight, could we have added some more mail and wire fraud counts earlier that there'd be zero dispute on? Probably, but I don't even think as we stand here right now, there's any real dispute on even these two mailings we're talking about. All right. Thank you. Thank you. Mr. Libby, you have some time left. So to convert an old tort term, you say that the letters speak for themselves. So to speak. A few things. One, opposing counsel just said that the fact that the lulling letters existed means that it was necessarily an ongoing offense. In Tanki, this court said that's absolutely false. That's a position the government continues to take, has taken in many other cases and in other circuits. And in Tanki, this court rejected that position. So that's not the case. It may be the case in other circuits. It recognized it might be creating a circuit split, but said that's not the case. What is the effect, if any counsel, of the fact that the record shows that your client paid himself $10,000 and other expenses for family use in, I believe it was January. That's certainly evidence the scheme is ongoing, right? No, I would say no, your honor. In fact, all that shows is that the person who already defrauded these individuals out of their money is now spending his own gains. But is it that one way to look at it, but then the other way to look at it, and it's a jury verdict, don't they get all inferences? Well, the mere fact that he was spending the money that he'd already stolen, I don't think that there's really anything that you can, that there's any real. So there's not two ways to look at it. I don't believe that there is. That we should look at it as money he already had stolen. That's correct. That's correct. And that's where the issue of whether the scheme to defraud was over, and what Tanki says, you do have to look at the timing and determine whether or not the scheme ended, and you have to look at whether the government in fact, and it's whether the government proved at a minimum that the already conceived scheme involved a specific plan for evading detection. And that plan had to have occurred before the mailings were sent. And here, it's not as if, as in Samson, where they had alleged that in the indictment, that the lulling was part of the scheme from the beginning. They never alleged that. And the fact is, on this record, I don't think that you can in fact find that the government proved that point. All right. Thank you very much, counsel. United States versus Ferguson will be submitted. We'll take up SEC versus Brook Street Securities.
judges: WARDLAW, CALLAHAN, SMITH